IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10212
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL JAMES HERLIHY, D.O.

Defendant-Appellant.

_____

Appeal from the United District Court for the
Northern District of Texas
(3:96-CR-4-4-H)
_____

August 17, 1998


Before POLITZ, Chief Judge, REAVLEY, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]


The defendant appeals his convictions for conspiracy, making
false statements, and mail fraud.  He argues that the evidence is
insufficient to support the convictions and that the district court
misapplied the sentencing guidelines when it imposed an 84-month
term of imprisonment.  After thoroughly reviewing the record and
the submissions by the parties, we are convinced that the record
provides sufficient evidence to uphold the judgment of conviction.
We also hold that the district court committed no reversible error

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

with respect to its application of the sentencing guidelines.  For these reasons, as set out more fully *infra*, we affirm the judgment of conviction and sentence.

I

Dr. Daniel Herlihy began employment as a part-time contract physician at Central Arlington Medical Management Company/Central Arlington Family Health Center ("Central Arlington")--a weight loss clinic owned by Lisa Grossman[1]--in late 1990.  Most of the clinic's patients had responded to an intensive advertising scheme wherein the clinic offered a free medically-supervised weight loss program to those who qualified.  The clinic conducted a battery of tests[2] on new patients and requested completion of a medical history questionnaire purportedly to determine whether the patients were healthy enough to start a diet.  The patient would then meet with a doctor who would make a diagnosis on the basis of the test results and the patient's medical history.

Unbeknownst to the patients, the clinic then billed their respective insurance companies (one of which was the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"),

---

[1]Grossman was an indicted coconspirator who pled guilty to conspiring to defraud insurance companies by the submission of false charges.  The government dropped other charges against her in exchange for her testimony against the remaining defendants.

[2]The tests included a smack twenty-four, a CBC with differential, a thyroid profile, an EKG, and a pulmonary function test.  The clinic could negotiate a lower price per test by sending more tests to a particular laboratory and thereby increase its profitability through testing new patients.

an agency for the Department of Defense) for the tests and the doctor's diagnosis and treatment. Central Arlington pursued a policy of omitting overt claims related to its weight loss program because insurance companies rarely provided coverage for a diagnosis of obesity. Instead, the clinic physicians and staff would submit an HCFA 1500 form (the standard insurance claims form accepted by all insurance companies) that included the doctor's diagnosis premised on the test results, the medical history questionnaire, and conversations with the patient. The clinic never included obesity on the form as a reason for the patient's appointment.

Dr. Herlihy, somewhat reluctant at first, weighed the financial fat of the practice (so to speak) with Grossman and agreed to participate in the clinic's scheme to bill insurance companies for the tests and diagnoses, while trimming references to the weight loss program as the incentive for the patients' treatment. Indeed, in April 1992 he bought the clinic and took over its operation. He changed its name to St. Francis Family Care Clinic ("St. Francis Clinic") and moved it to a different location. Everything else about the clinic, however, remained virtually unchanged. The St. Francis Clinic continued its practice of submitting insurance claims for the tests and diagnoses of the diet program's participants--without mentioning the patient's treatment for weight loss.

3

Things began to melt down for Dr. Herlihy when a local television station ran an exposé on the St. Francis Clinic and its billing practices relating to the advertised weight loss program. Federal authorities investigated the matter and indicted Dr. Herlihy and others for multiple counts of conspiracy, mail fraud, and making false claims to a government agency. After a full jury trial, Dr. Herlihy was convicted on one count of conspiracy to commit mail fraud and to make false claims to a government agency, two counts of making such false claims, and nine counts of mail fraud. The district judge sentenced him to a total of eighty-four months of imprisonment. Dr. Herlihy appeals both his conviction and sentence.

## II

### A

Dr. Herlihy first argues that the evidence will not support his convictions. When evaluating an insufficiency of evidence claim, we view the record and all reasonable inferences to be drawn therefrom in the light most favorable to the government to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. United States v. Greer, 137 F.3d 247, 249 (5th Cir. 1998) (citing United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)); United States v. Burton, 126 F.3d 666, 669-70 (5th Cir. 1997). "'The evidence need not exclude every reasonable hypothesis of innocence

4

or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.'" Burton, 126 F.3d at 669-70 (quoting United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994)).

Whether the evidence is direct or circumstantial, our review does not change. Burton, 126 F.3d at 670. What we may not do is reweigh the evidence or assess the credibility of the witnesses; instead we must "'accept all credibility choices that tend to support the jury's verdict.'" Sneed, 63 F.3d at 385 (quoting United States v. Anderson, 933 F.2d 1261, 1274 (5th Cir. 1991)); United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).

B

(1)

Dr. Herlihy first attacks his convictions for two counts (counts 9 and 10) of making a false statement to a government agency in violation of 18 U.S.C. § 1001. Section 1001 sets out criminal penalties for:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any [materially] false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any [materially] false, fictitious or fraudulent statement or entry . . . .

18 U.S.C. § 1001. To prevail on a false statement claim, the government must prove that the defendant (1) made a statement (2)

5

that was false (3) and material (4) with specific intent to deceive (4) within the purview of government agency jurisdiction. United States v. Shah, 44 F.3d 285, 288-89 (5th Cir. 1995) (quoting United States v. Puente, 982 F.2d 156, 158 (5th Cir. 1993)); United States v. Leal, 30 F.3d 577, 583-84 (5th Cir. 1994).

The government contends that Dr. Herlihy knowingly submitted false claims for payment to CHAMPUS for diagnosis and treatment of Sandra Baugh. Dr. Herlihy maintains that his claims for services provided to Ms. Baugh were technically true, thus, placing the second factor--falsity--in contention. "We cannot uphold a conviction . . . where the alleged statement forming the basis of a violation of section 1001 is true on its face." United States v. Moses, 94 F.3d 182, 188 (5th Cir. 1996). We thus turn to the evidence in the record regarding Dr. Herlihy's diagnosis and treatment of Ms. Baugh.

Dr. Herlihy submitted claims for reimbursement from CHAMPUS for diagnosis and treatment of carpal tunnel syndrome, allergic rhinitis, blood, thyroid, and urinalysis. He did not make any claim for treatment of obesity, nor did he list weight loss as a reason for Ms. Baugh's clinic visit, although the evidence showed that she was lured to the St. Francis Clinic only after viewing a television commercial advertising the free weight loss program. Although Ms. Baugh included on her medical history questionnaire past physical ailments including carpal tunnel syndrome, she did not seek treatment for, nor--more importantly--did she receive

6

treatment of, any physical condition except obesity. Dr. Herlihy's submission of claims for his purported treatment of Ms. Baugh's various and sundry medical conditions thus constitutes a false statement within the meaning of § 1001.[3] A reasonable trier of fact, when presented with this evidence, could have found that the government proved each element of the charged offense under the False Claims Act beyond a reasonable doubt.

### (2)

Dr. Herlihy also argues that the evidence is insufficient to support his convictions for counts 12 through 20, charging him with mail fraud against Blue Cross/Blue Shield and Aetna Insurance Company in violation of 18 U.S.C. § 1341. To prevail under this statute, the government must prove (1) a scheme to defraud; (2) the use of mails to execute that scheme; and (3) the defendant's specific intent to commit fraud. United States v. Tencer, 107 F.3d 1120, 1125 (5th Cir. 1997) (citing United States v. Fagan, 821 F.2d 1002, 1008 (5th Cir. 1987)). "[C]ompletion of the alleged scheme must depend in some way on the information or documents that passed through the mail." Id. (citing United States v. Pazos, 24 F.3d 660, 665 (5th Cir. 1994)).

---

[3]In fact, Dr. Herlihy admits in his brief that he submitted reimbursement claims for treatment of Ms. Baugh's various conditions, but that she "was not specifically treated for each of these conditions." Appellant's Brief at 16. The court is in the dark as to how Dr. Herlihy can claim that insufficient evidence exists to support his conviction of counts 9 and 10 when he has admitted that he made claims for treatments that he never administered.

The government maintains that it presented evidence demonstrating that the insurance companies mailed reimbursement checks to Dr. Herlihy for payment of the false claims he had submitted. Each count of mail fraud posited that a specific check had been mailed in furtherance of the fraud. Dr. Herlihy argues, however, that the government failed to demonstrate that the specific checks were reimbursement for false claims in the light of the evidence that a portion of Dr. Herlihy's practice included valid claims for reimbursement. See Tencer, 107 F.3d at 1125-27 (reversing mail fraud convictions for failure of government to connect each individual check with a fraudulent claim). He contends that Blue Cross made its payments in bulk and that the checks themselves did not identify for which specific claim they were providing remuneration.

The government introduced documentary evidence, however, that ties each check in counts 12 through 20 to a specific false claim. The insurance companies attached to each check a Provider Claims Transaction Report that listed the dates on which services had been rendered and the total charges for those service dates. Also introduced as government exhibits were the relevant patients' health insurance claim forms and explanation of benefits forms setting out with what illness they purportedly had been diagnosed on a certain date and what services or treatment had been

8

rendered.[4]  When combined with the patients' testimony concerning the falsity of the health insurance claim forms, the evidence is more than sufficient to tie each particular check to a false claim.[5]

(3)

Dr. Herlihy similarly challenges his convictions for counts 12, 15, 18, and 20, which charge him with submitting false claims for treatment of Barbara Brem, Connie Spagnoli, and Ronda Barnes. Dr. Herlihy, however, never treated these individuals; another clinic doctor, Dr. Yeoham, did.  Dr. Herlihy maintains that insufficient evidence exists to hold him responsible, either as a conspirator or an aider and abettor, for Dr. Yeoham's misconduct.

---

[4]Although the documentary evidence is not quite as specific with respect to count 12, the government elicited testimony at trial sufficient to demonstrate a connection between the check in that count and a false claim.

[5]Although the amounts of the checks themselves do not match the amounts listed in the indictment, this discrepancy is of no moment.  The amounts listed on the Provider Claims Transaction Report, which was attached to each particular check, correlate with the amounts in the indictment when only the amounts for which the evidence supports a finding of a false claim are added together. For instance, count 13 charges that a check dated January 11, 1993, provided reimbursement in an amount of $202.13 for two particular service dates, December 10 and 14, 1992.  The actual check itself, however, provides for payment in an amount of $295.93--a difference of $93.80.  The relevant insurance forms that evidence false claims list service dates of December 10 and 14.  The Provider Claims Transaction Report lists service dates of December 10, 14 and 22 with corresponding charges of $157.13, $45.00, and $93.80, respectively.  There is no evidence that the claim for reimbursement for services rendered on December 22 was false and that amount of $93.80 was not included in the indictment.  The remaining amount of the check, $202.13, is the exact amount listed in the indictment.

9

A conviction for conspiracy requires proof of (1) an agreement between two or more persons (2) to violate the law (3) and the commission of an overt act by at least one coconspirator in furtherance of the unlawful scheme. United States v. Clark, 139 F.3d 485, 489 (5th Cir. 1998) (discussing conviction under 18 U.S.C. § 371); United States v. Chappell, 6 F.3d 1095, 1098 (5th Cir. 1993) (same). The agreement among coconspirators need not be formal or expressly stated and may be inferred by proof of concert of action, but the evidence must sufficiently demonstrate that the defendant's participation in the conspiracy was knowing and voluntary. Clark, 139 F.3d at 489; United States v. Sidhu, 130 F.3d 644, 648 (5th Cir. 1997); Chappell, 6 F.3d at 1098. A defendant may be convicted of aiding and abetting a substantive criminal offense "when he associates with the criminal activity, participates in it, and acts to help it succeed." United States v. Delagarza-Villarreal, 141 F.3d 133, 140 (5th Cir. 1998); Sidhu, 130 F.3d at 650; United States v. Thorn, 917 F.2d 170, 175 (5th Cir. 1990); see 18 U.S.C. § 2.

Dr. Herlihy argues that the government "failed to establish the existence of any unlawful agreement between Doctors Herlihy and Yeoham." In essence, he submits that he never advised Dr. Yeoham as to her diagnoses and that he had no reason to question her diagnoses or treatments. He argues that he signed her claim forms without any knowledge that they included inaccurate, and thereby false, statements. The government maintains, however, that Dr.

10

Herlihy should be held responsible for his own criminal conduct--not that of Dr. Yeoham--in that "[e]ach of the insurance claims submitted for reimbursement in each of the challenged counts bore Herlihy's name and signature." Appellee's Brief at 15. We must uphold the convictions if a reasonable juror could have concluded beyond a reasonable doubt that Dr. Herlihy knew the claims forms he signed contained false information.

The record contains sufficient evidence upon which we may rely to affirm Dr. Herlihy's conviction of counts 12, 15, 18, and 20. The record is replete with evidence from which one could readily infer Dr. Yeoham's complicity in the scheme to defraud the insurance companies by falsifying diagnoses and refusing to acknowledge on insurance forms the patient's participation in the clinic's weight loss program. Dr. Herlihy also was well aware of the scheme to defraud and of other staff members' participation in the scheme. The record amply supports the jury's finding that Dr. Herlihy knew the statements contained in the insurance claims were false--irrespective of the fact that he did not treat those particular patients.

(4)

As a final catch-all argument, Dr. Herlihy contests the government's proof of his intent to defraud--an element necessary to uphold his convictions for conspiracy, false claims, and mail fraud. United States v. Krenning, 93 F.3d 1257, 1264 (5th Cir. 1996) (conspiracy and mail fraud); Shah, 44 F.3d at 289 (false

11

claims).  Dr. Herlihy maintains that he submitted claims only for services rendered for which he was entitled to reimbursement.  He contends that all of the laboratory tests for which he requested compensation from the insurance companies actually were performed and medically were necessary before a patient began the clinic's stringent weight loss program.  According to Dr. Herlihy, the clinic also provided specific treatment to a number of patients for medical conditions in addition to obesity and properly submitted claims for these services.

The government presented evidence specifically relevant to the treatment and diagnoses of nine patients.  It also introduced testimony concerning the general manner in which Dr. Herlihy conducted clinic business.  Dr. Herlihy issued explicit instructions to his staff that participation in the clinic's weight loss program should not be listed as a reason for the patient's visit to the clinic on the patient's chart.  He also advised that the staff should ferret out any signs or symptoms for treatment of conditions other than obesity.  Finally, he instructed staff members to alter or destroy evidence and he attempted to intimidate employees in an effort to dissuade them from cooperating fully with investigating authorities.  On the basis of the evidence in the record, a reasonable finder of fact could have found beyond a reasonable doubt that Dr. Herlihy acted with the requisite intent to defraud.

III

A

In addition to his sufficiency of the evidence arguments, Dr. Herlihy also maintains that the trial court abused its discretion when it allowed the introduction of hearsay into evidence after erroneously concluding that the statements were those of a coconspirator made in furtherance of the conspiracy. We review admission and exclusion of evidence by a district court for abuse of discretion. United States v. Fike, 82 F.3d 1315, 1329 (5th Cir. 1996); United States v. Krout, 66 F.3d 1420, 1426 (5th Cir. 1995); United States v. McConnell, 988 F.2d 530, 533 (5th Cir. 1993). Hearsay, which generally is inadmissible, is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Certain out-of-court statements, however, have been exempted from that definition and constitute admissible nonhearsay. One such example is a statement offered against a party that is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E); Fike, 82 F.3d at 1329. The prosecutor must prove by a preponderance of the evidence "(1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy." United States v.

13

Ruiz, 987 F.2d 243, 247 (5th Cir. 1993); United States v. Burton, 126 F.3d 666, 671 (5th Cir. 1997). The district court may consider the contents of the statements sought to be admitted in making the factual determination whether a statement falls within the coconspirator exemption and we review only for clear error. Burton, 126 F.3d at 671; Krout, 66 F.3d at 1426.

Dr. Herlihy specifically objects to the district court's admission of Grossman's testimony concerning her telephone conversations with two St. Francis Clinic employees: Corinne Shea and Toni Smith. Shea's statements, testified to by Grossman, are as follows:

> Corinne [Shea] was very concerned about the tenor and the light in which the situation was portrayed. Attempting to explain to me what had happened, how it had happened, why it wasn't exactly the way that it appeared. And we had some -- we were friends, so we had some conversations about that.

2 Supp. Record at 120. The district court clearly erred when it found that Shea's statements to Grossman were made in furtherance of the conspiracy. The conversation appears to constitute only a discussion between friends and the government has failed adequately to explain how Shea's statements furthered any conspiratorial activity.[6] That Shea's statements were erroneously admitted,

---

[6]Perhaps Shea recognized the fact that Grossman was a likely candidate for interview with the authorities and she was attempting to prime Grossman's answers to interrogatories by explaining "why it wasn't exactly the way it appeared." Statements made for the purpose of concealing a conspiracy fall within the evidence rule's definition of nonhearsay. United States v. Broussard, 80 F.3d 1025, 1039 (5th Cir. 1996); United States v. Barksdale-Contreras,

however, does not end our inquiry. Erroneous admission of hearsay constitutes reversible error only when the testimony has a substantial impact on the jury's verdict. <u>United States v. Dickey</u>, 102 F.3d 157, 163 (5th Cir. 1996). The three sentences of inadmissible hearsay set out above could not have had a substantial impact on the verdict so as to justify reversal in that they are clearly immaterial and nonprejudicial. Furthermore, Shea testified during the trial and was thus available for cross-examination.

Grossman's testimony concerning Smith's statements was more substantial:

> She called me to tell me that she had been contacted by, I believe it was Rex Whitaker, but that office of the postal inspector. But she had not spoken to him yet and she wanted to know if I thought that she should speak to him. And of course, I told her yeah, you should speak with him. She said, well, I got a piece of paper, and I don't know what to do with it. And I asked her to tell me, in fact, what she was talking about. And she told me she had a piece of paper that was instructing somebody, I believe, by the name of Resa to take the ledger cards and change them from "diet services 300" to "medical services 300" and that I think it might be written by Corinne and she had said at Dr. Herlihy's instructions. There was a lot of stuff after the news stuff going on at the clinic. People running around, files being pulled, things being changed. And she had come upon this piece of paper and what did I think she should do with it. I asked her to send it to me thinking at some point in time with what was going on in the investigation it might prove valuable to me to have it. She didn't want to do that so I then told her don't destroy it, you know, meet with the government. You have to meet with them, anyway,

---

972 F.2d 111, 114-15 (5th Cir. 1992); <u>United States v. Esacove</u>, 943 F.2d 3, 5 (5th Cir. 1991); <u>United States v. Del Valle</u>, 587 F.2d 699, 704 (5th Cir. 1979). The government, however, failed to demonstrate this, or any other, rationale behind Shea's statements by a preponderance of the evidence.

and give it to them.  She said, what should I tell them?
I said tell them the truth.  Tell them everything you
told me on the phone today.  And I had not spoken with
her again, but through subsequent development I found out
that, yes, in fact she did speak with the government and
she did turn that letter over to them.

2 Supp. Record at 121-22.  The government's arguments concerning Smith's statements are more persuasive.  The statement's context indicates that Smith was employed at the St. Francis Clinic at the time she discovered the note and the record is replete with evidence indicating that all of the clinic's employees were aware of and participants in the scheme to disguise obesity diagnoses and treatments as other covered, and thus reimbursable, ailments and services.  The district court thus did not clearly err in determining that the prosecution proved by a preponderance of the evidence that Smith was a coconspirator at the time she made the statement.

Neither did the court commit clear error when it found that the statement was made in furtherance of the conspiracy.  As noted *supra* in note 5, statements made for concealment purposes are considered to have been made in furtherance of the conspiracy. From the context of the statement, the district court could have concluded that Smith was considering destroying or otherwise concealing the incriminating document.  Although perhaps debatable, the district court's decision that Smith was a coconspirator and that her statements were made in furtherance of the conspiracy is not clearly erroneous.  In the light of these findings, the

16

district court did not abuse its discretion when it allowed the challenged testimony.

B

Dr. Herlihy next argues that the district court abused its discretion in failing to give his requested jury charge. We review only for abuse of discretion a district court's refusal to give a requested instruction and we consistently have noted that a district court has "substantial latitude in formulating the jury charge." United States v. Pipkin, 114 F.3d 528, 535 (5th Cir. 1997); United States v. Asibor, 109 F.3d 1023, 1034 (5th Cir. 1997); United States v. Laury, 49 F.3d 145, 152 (5th Cir. 1995). We will reverse only where the requested instruction (1) is substantively correct, (2) was not substantially covered in the court's charge, and (3) concerns so important a point in the trial that the failure to instruct on it materially impairs the defendant's ability to present his defense. Pipkin, 114 F.3d at 535; Laury, 49 F.3d at 152.

Dr. Herlihy specifically contends that the court failed adequately to charge the jury on his theory of defense. A defendant is "entitled to have the jury instructed on a theory of the defense for which there is any foundation in the evidence." United States v. Cordova-Larios, 907 F.2d 40, 42 (5th Cir. 1990). Dr. Herlihy's theory of defense focused in part on his purported lack of knowledge as to the falsity of the insurance claims and his lack of any intent to defraud. His requested jury instruction No.

17

4 (Intent-Deliberate Purpose) set out in sum that, in order for the jury to find Dr. Herlihy guilty, it had to find that he acted with "deliberate purpose to defraud" and that he "knowingly and intentionally sought to deceive another." Requested jury instruction No. 11 also noted that the jury "must find not only that the diagnosis and claim were false, but that defendant had actual knowledge at the time he was making such diagnosis and claims that they were in fact false," and that it could not convict for acts of accident, mistake, or negligence.

Notwithstanding Dr. Herlihy's arguments to the contrary, the court's jury charge adequately conveyed the substance of his defense. In addition, the given instructions set out specific definitions with respect to terms such as "knowingly," "willfully," and "specific intent." Furthermore, Dr. Herlihy's requested instruction No. 11 was incorrect inasmuch as it would have allowed the jury to acquit if it found that the diagnoses actually recorded were accurate, irrespective of the fact that Dr. Herlihy should have provided other diagnoses or details to the insurance companies. The indictment, however, also charged Dr. Herlihy with claiming reimbursement for treatment for the diagnosed illnesses listed on the claims forms that he never actually administered. The court did not abuse its discretion when it refused Dr. Herlihy's requested instructions numbered 4 and 11.

Dr. Herlihy also maintains that the district court's failure to give his requested jury instruction No. 10 constitutes

18

reversible error. This requested instruction sets out that Dr. Herlihy's violation of any "federal or state health care regulation or insurance standard . . . does not without more justify the conclusion that he committed the separate and distinct criminal offenses charged. . . . A mere violation of a health care regulation is not a criminal offense."

The prosecution presented evidence, without objection, that CHAMPUS plainly requires the statement of the reason or reasons for a patient's visit to be asserted on the insurance claim form. The St. Francis clinic never listed obesity on any claim form. Instead, Dr. Herlihy submitted claims for false diagnoses that disguised the true reason for the patient's visit, which representation constituted the making of false statements to a government agency as charged in counts 9 and 10. The false statements in the form of the ostensible diagnoses on the claims forms, however, also violated the agency's regulations that the reason for the visit be listed on the claim form. Because of the charges against Dr. Herlihy for making false statements to CHAMPUS, the district court properly concluded that the requested jury instruction might have confused the jury. In addition, the court adequately instructed the jury as to the elements of each charged offense, none of which permitted a conviction based solely on an inadvertent violation of any agency regulation or insurance standard. The district court did not abuse its discretion when it refused to give Dr. Herlihy's requested instruction No. 10.

19

In his final point of error with respect to the trial itself, Dr. Herlihy argues that the district court abused its discretion when it refused to excuse for cause ten prospective jurors who recently had served together on a social security fraud case and had returned a guilty verdict. Dr. Herlihy was forced to exhaust his peremptory strikes to remove five of the challenged jurors, and two of the ten were seated on his panel. He notes that he would have preferred striking several others had he not already used his peremptory strikes.

We review a district court's ruling as to juror impartiality for manifest abuse of discretion. United States v. Munoz, 15 F.3d 395, 397 (5th Cir. 1994). That jurors have served together in the past, however, is no per se indication of presumptive partiality. United States v. Basey, 816 F.2d 980, 1001 (5th Cir. 1987); United States v. Jefferson, 569 F.2d 260, 261 (5th Cir. 1978). "The rule in this Circuit, and indeed in all of the federal courts, is that prior jury service during the same term of court in another criminal case is not, standing alone, a sufficient basis to support a challenge for cause." Jefferson, 569 F.2d at 261; see also United States v. Mutchler, 559 F.2d 955, 959 (5th Cir. 1977). Counsel instead must show "specific evidence that the prior service biased a particular juror." Jefferson, 569 F.2d at 261.

Dr. Herlihy has not directed our attention to any specific evidence demonstrating that the prior service biased any of the

particular jurors that made up his venire or sat on his panel so as to justify their excuse for cause. The district court inquired as to each juror's impartiality and whether their prior service affected in any untoward way their ability to provide Dr. Herlihy with a fair and unbiased jury panel. All responded in the negative. The court also further honored Dr. Herlihy's request for more specific inquiry regarding the prior social security fraud case. Although the prior case and the case against Dr. Herlihy both involved charges of fraud perpetrated against the government, the trial court properly determined that the cases were sufficiently dissimilar in several respects and that neither the prosecutor nor any witnesses overlapped from the first case to Dr. Herlihy's. The court did not abuse its discretion when it declined to strike for cause the ten challenged jurors.[7]

IV

A

Finally, Dr. Herlihy argues that, even if we affirm his convictions, we must reverse his sentence for several errors in the district court's application of the sentencing guidelines. We review the district court's application and legal interpretation of the sentencing guidelines *de novo*, and its findings of fact for

---

[7]Dr. Herlihy's reliance on our reasoning in prior cases dealing with interim jury service is misplaced in that this case does not deal with interim service. The reasoning of those cases is inapposite inasmuch as they discuss the specific dangers relevant solely to interim service.

clear error.  <u>United States v. Wyjack</u>, 141 F.3d 181, 183 (5th Cir. 1998).

(1)

Dr. Herlihy initially maintains that the district court erroneously calculated the amount of loss attributable to him.  The district court held Dr. Herlihy responsible for $1,015,052.63 in losses due to the fraud perpetrated on the insurance companies and CHAMPUS, which resulted in an eleven-level enhancement of his offense level pursuant to U.S.S.G. § 2F1.1(b).  Dr. Herlihy submits that the correct amount of loss was between $20,000 and $40,000.  We review a district court's loss calculation as a factual finding subject only to clear error scrutiny.  <u>United States v. Peterson</u>, 101 F.3d 375, 384 (5th Cir. 1996); <u>United States v. Ismoila</u>, 100 F.3d 380, 396 (5th Cir. 1996).

The dispute between the different amounts of loss centers on "the percentage of insurance claims attributable to unreimbursable weight loss treatment and the extent to which Dr. Herlihy should be held responsible for claims made by the Grossman's Central Arlington Clinic."  Appellant's Brief at 43.  Dr. Herlihy maintains that the district court erroneously bootstrapped to his offense level the losses incurred by Grossman when she operated the clinic.  The sentencing guidelines allow a defendant to be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).  Dr. Herlihy maintains that he never acted in

22

concert with Grossman in executing her illegal undertaking and that he should not be held responsible for the losses incurred when she owned the clinic.

Specifically, Dr. Herlihy disputes the district court's imposition on him of losses incurred from May 1, 1991, until March 1992. The presentence report actually indicated that Dr. Herlihy knew of and participated in the scheme as early as January 1991. Testimony adduced at the sentencing hearing (as well as that referenced from the trial) evidenced Dr. Herlihy's early knowledge of the fraudulent billing scheme as well as his acquiescence and cooperation with Grossman in perpetrating the "fat" fraud. The district court did not clearly err when it held Dr. Herlihy responsible for losses incurred as early as May 1, 1991, under Grossman's watch.

Similarly, the court did not clearly err when it determined the percentage of clinic deposits to use as a base reference for calculating the losses suffered by the insurance companies and CHAMPUS. The case agent, Postal Inspector Rex Whiteaker, testified at the sentencing hearing as to the rationale underlying his calculation of the losses incurred. The evidence was very thorough and Whiteaker explained how he relied upon patient interviews, employee interviews, bank records, and clinic records in determining the percentages.[8] In the light of all of the evidence,

---

[8]The case agent determined that 80% of the payments made to Central Arlington and 75% of those made to the St. Francis Clinic

23

the actual amount of loss as found by the district court was derived from a conservative estimate of illegitimate claims and is not clearly erroneous.

(2)

Dr. Herlihy next argues that the district court clearly erred when it applied to his sentence a two-level enhancement for abuse of a position of trust.  The sentencing guidelines provide for the enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  Dr. Herlihy insists that he did not occupy a position of trust vis-a-vis the insurance companies.  His argument, however, is undercut by our recent opinion in United States v. Iloani, 143 F.3d 921, 1998 WL 307190, *2 (5th Cir. 1998).  Iloani is directly on point and controls our decision as to this issue.  The district court did not err in applying the § 3B1.3 enhancement to Dr. Herlihy's sentence.

(3)

As his final point of contention, Dr. Herlihy argues that the district court clearly erred when it determined that he had obstructed justice.  The court applied U.S.S.G. § 3C1.1, which provides for a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

---

were the result of fraudulent billings.

24

administration of justice during the investigation, prosecution, or sentencing of the instant offense." Dr. Herlihy maintains that there was no ongoing government investigation at the time he allegedly altered certain medical records and that the evidence involved was not material in nature. United States v. Lister, 53 F.3d 66, (5th Cir. 1995). Neither of these arguments has any merit under our review of the record[9] and we AFFIRM the district court's imposition of the two-level enhancement.

IV

For the foregoing reasons, the defendant's judgment of conviction and sentence is

A F F I R M E D.

---

[9]Although the parties disputed in their briefs whether Dr. Herlihy had presented these claims to the district court, the government conceded at oral argument that he had raised them. We thus review for clear error instead of plain error. United States v. Rickett, 89 F.3d 224, 226 (5th Cir. 1996).